In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00342-CR
NO. 09-18-00343-CR
NO. 09-18-00344-CR
NO. 09-18-00345-CR
NO. 09-18-00346-CR
NO. 09-18-00347-CR
NO. 09-18-00348-CR

_____

**JOSEPH ALEXANDER SWANSEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 411th District Court**
**Polk County, Texas**
**Trial Court Cause Nos. 25,406, 25,407, 25,408,**
**25,409, 25,410, 25,411, 25,412**

---

**MEMORANDUM OPINION**

Joseph Alexander Swansey appeals from his convictions on seven felonies,

which are all based on one incident when Swansey fired a rifle at a house where his

1

former girlfriend "Sally" and five others, including her current boyfriend, lived.[1] The record from the trial shows that in March 2017, the Polk County Sheriff's Office sent Deputy Josh Sanders to a house in Polk County to investigate a complaint Sally's boyfriend "John" made that morning about a text message that Swansey sent Sally. The message stated that "he was going to come kill [John]."

Swansey drove a truck into the driveway of the home. After he pulled into the driveway, Swansey rolled down the window of his truck and fired a rifle at the people standing in front of the house. The group outside the house included Swansey's former fiancé, "Sally," John, members of their respective families, and Deputy Sanders. John's mother was inside the home.

Subsequently, to address the shooting, the State filed seven separate indictments against Swansey, trial court cause numbers 25,406-25,412. The cases were then handled before a jury in a consolidated trial involving all seven of the cases. Swansey resolved trial court cause number 25,406, the case in which the State indicted him for the attempted capital murder of Deputy Sanders, by pleading guilty to a lesser offense, aggravated assault on a public servant. Even though he pleaded

---

[1] Except for the deputy sheriff and Swansey, who was also at the house, the names we have used in the opinion referring to the others who were at the house when the shooting occurred are fictitious. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

guilty in that case, Swansey had the jury decide his punishment in that case and the parties tried issues of guilt and punishment in the remaining six cases, causes 25,407-25,412. In those cases, which addressed the shots he fired at everyone else who was at John's house, the State tried Swansey on six counts of aggravated assault that involved his use of a deadly weapon.

In the guilt-innocence phase of his trial in trial court cause number 25,407, the case involving Swansey's indictment for shooting at John, the jury found Swansey guilty of aggravated assault with a deadly weapon. In the remaining cases (cause numbers 25,408, 25,409, 25,410, 25,411, and 25,412), however, the cases involving other indictments, the jury found Swansey guilty on five counts of deadly conduct,[2] a lesser-included offense from the more serious offense of aggravated assault.

In the punishment hearing that followed, the jury found that Swansey should serve a  substantial sentence. In the case involving his conviction in cause number 25,407, the jury gave Swansey a ninety-nine-year sentence based on shooting at Deputy Sanders. In the case involving Swansey's conviction for shooting at John, the jury assessed a nineteen-year sentence. In the remaining five cases, which

---

[2] Tex. Penal Code Ann. § 22.05(b) ("A person commits an offense if he knowingly discharges a firearm at or in the direction of: (1) one of more individuals; or (2) a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied.").

involved convictions on five counts of deadly conduct, the jury assessed ten-year sentences. In all seven of the cases, the jury also assessed fines of $10,000.

Swansey raised eight issues in the brief he filed to support his appeal. In Swansey's first issue, he argues the trial court erred when it denied his motion for mistrial. Swansey made the motion for mistrial while Texas Ranger Brandon Bess was on the stand. During Ranger Bess's testimony, the prosecutor objected to a question that Swansey's attorney asked Ranger Bess on the basis that the question called for hearsay. The record shows Swansey's attorney asked Ranger Bess to testify whether Swansey told him why he "broke off the attack[.]" The prosecutor, expounding on his hearsay objection, then said: "Why [Swansey] broke off the attack, there's one way to get that before this jury, and it's not through this witness." Swansey moved for mistrial, arguing that the question amounted to a comment by the prosecutor that criticized Swansey for exercising his right not to testify in the trial.

In issue two, Swansey complains about another of the trial court's ruling admitting evidence in the guilt-innocence phase of his trial. In this issue, Swansey suggests the trial court erred when, at the State's request, the court allowed the jury to hear a motorist testify that, following the shooting at John's house, Swansey shot

4

at her after he passed her in his truck.[3] Relying on Rule 404 of the Texas Rules of Evidence, Swansey argues that the motorist's testimony, which described his conduct when he passed another motorist after the shooting, was conduct of an extraneous crime or bad act that the trial court should have excluded in his trial.[4]

Swansey's next three issues, issues three through five, complain about various errors that he argues occurred in the punishment phase of his trial. In issue three, Swansey argues the trial court erred by admitting six recordings of telephone calls that he made from jail following his arrest. Swansey suggests the trial court erred in admitting the recordings into evidence either because they were not relevant, or because they were more prejudicial than probative on the issues that were relevant in punishment. In issue four, Swansey complains the trial court erred by allowing the State to call Dr. Sheri Gaines, a psychiatrist, to rebut his mother's testimony about Swansey's mental condition and to express an opinion that Swansey is so dangerous he cannot be reformed. In issue five, Swansey argues the trial court erred by excluding testimony he wanted to introduce through Ranger Bess to show that Swansey apologized to the officer for firing a rifle at John's home.

---

[3] *See* Tex. R. Evid. 404 (Character Evidence; Crimes or Other Acts).
[4] *Id.*

In issues six and seven, Swansey argues the trial court erred by taxing him with certain costs of court. To support his argument, Swansey notes the Court of Criminal Appeals has declared certain costs, which the trial court required him to pay in the seven judgments, to be unconstitutional. In his last issue, issue eight, Swansey contends that, because the State tried him in a single proceeding, the trial court could not render a judgment that fined him more than once and that in these judgments, the judgments require that he pay seven $10,000 fines.

For the reasons explained below, we conclude that Swansey's first two issues, which concern alleged errors in the guilt-innocence phase of his trial, lack merit. We affirm Swansey's conviction in all seven of the cases. Turning to Swansey's remaining issues, which address the punishment phase of his trial, we conclude that the trial court erred by admitting parts of the recorded telephone conversations that occurred between Swansey and members of his family while he was in jail. We further conclude that the record does not provide fair assurance sufficient to establish that those errors did not affect Swansey's substantial rights. Based on our conclusion that errors affecting Swansey's substantial rights occurred during the punishment phase of the trial, we reverse the seven judgments limited to the verdicts on punishment only. To remedy these errors, we remand the cases, trial court causes 25,406-25,412, to the trial court for new trials on punishment.

6

## Factual Background

We discuss the background facts only as required to explain our resolution of the issues in Swansey's brief. As Swansey acknowledges, most of the facts that led to the shooting are undisputed. The testimony in the trial shows that Swansey and Sally broke up in late 2016 or early 2017. When they broke up, she moved out. The month Sally left Swansey, she began dating John. Shortly after that, Sally and John began living together, along with John's two children and Sally's and Swansey's son, "Bill."

On March 6, 2017, Bill fell ill. When Swansey learned Bill was ill, he wanted to see Bill. Sally would not allow him to do so. Angry that Sally was not letting him see his son and upset that she was living with John, who had been one of Swansey's best friends, Swansey sent Sally a text message in the early morning hours of March 7, 2017. In the message, Swansey stated he intended to kill John. When John learned that Swansey had threatened to kill him, he reported the threat to the Polk County Sheriff's Office. The Sheriff's Office sent Deputy Sanders to investigate John's complaint. Deputy Sanders pulled his SUV into the driveway of John's home. The SUV has emergency lights and is marked with the word "SHERIFF" in large letters on the SUV's back door.

7

John and Sally came outside to talk to Deputy Sanders. While Deputy Sanders was waiting for John to complete his written statement about the threat, a white truck turned into the driveway. John recognized Swansey as the person driving the truck. As Deputy Sanders approached the truck, he "saw a barrel of a rifle come out of the driver's side window." Deputy Sanders moved behind his SUV and drew his pistol. Swansey opened fire. Deputy Sanders fired back. Deputy Sanders testified the shootout lasted about one or two minutes. Several bullets from Swansey's rifle hit the deputy's SUV. Others struck areas inside and outside John's home. The testimony in the trial described the positions of the people inside and outside John's home when the shooting occurred. Photographs in evidence show the damage bullets from Swansey's rifle did to the SUV and the house. When Swansey quit shooting, he backed out of the driveway and took off. Sanders gave chase in his SUV. After backing out of the driveway, Deputy Sanders activated his emergency lights. Swansey refused to stop. Soon after, Deputy Sanders lost sight of Swansey's truck.

While making his getaway, Swansey passed a car driven by "Barbara."[5] Barbara testified in the trial. Barbara explained that she began following Swansey's truck when she noticed he was being chased by a police officer. At one point,

_____

[5] "Barbara" is a fictitious name. Swansey fired his gun several times at Barbara's car when he passed her in is truck. Barbara's testimony about this shooting is an extraneous crime that is the subject of Swansey's complaint in issue two.

Swansey, while driving his truck, fell behind Barbara's car. When Swansey caught up, he discharged his gun at Barbara's car when he passed her in his truck. Shortly after that, Swansey lost control of his truck while turning, which allowed Deputy Sanders to catch up. After that, Deputy Sanders found Swansey and placed him under arrest.

In closing argument, Swansey's attorney argued that Swansey did not knowingly or intentionally threaten anyone other than Deputy Sanders with his gun. In the case involving the indictment that charged Swansey with firing at John, the jury found Swansey guilty of aggravated assault with a deadly weapon, a first-degree felony.[6] In the other five cases, which involved the shots Swansey fired toward the house while Sally, three children, and John's mother were there, the jury found Swansey guilty on five counts of deadly conduct.[7] As previously mentioned, Swansey pleaded guilty to the indictment charging him with committing an aggravated assault against a public servant, which is the case that involved Swansey's conduct in shooting at Deputy Sanders.

---

[6] *See* Tex. Penal Code Ann. § 22.02(b) (the aggravated assault elevates the penalty to a first-degree felony if the defendant uses a deadly weapon in committing the assault or uses a deadly weapon during the commission of an assault against a public servant acting under color of the servant's office).

[7] *See id*. § 22.05.

Analysis

Motion for Mistrial

In his first issue, Swansey argues the trial court erred by denying his motion for mistrial. According to Swansey, when the prosecutor made a hearsay objection to the question his attorney posed to Ranger Bess, the prosecutor made a comment highlighting the fact that Swansey was not going to testify during the trial.

Swansey's argument suggest the prosecutor knew Swansey would not testify, but the record does not support that claim. The prosecutor lodged the hearsay objection to a question that Swansey's attorney asked in the guilt-innocence phase of the trial during the State's case-in-chief. And the prosecutor did not specifically mention Swansey in his objection. Instead, the prosecutor, while explaining the basis of his hearsay objection, said "there's one way to get that before this jury, and it's not through this witness." The transcript of the trial shows that Swansey did not immediately move for a mistrial when the prosecutor made the above comment. Swansey did raise his objection, however, a short time later when the court recessed the trial for lunch.[8] The trial court heard the motion during the lunch break. The State

_____

[8] In part, the State argues Swansey failed to perfect his complaint about the comment because he did not object when the comment occurred. The transcript from the trial shows that Swansey asked Ranger Bess around five more questions before moving for a mistrial. The trial court denied the motion before the prosecutor responded to Swansey's motion, and the court did not state the reason it was denied.

10

suggests in its brief that Swansey failed to preserve the alleged error because he failed to object immediately when the prosecutor made the comment in the trial. But we need not decide whether the short delay that is at issue here resulted in a waiver of Swansey's right to complain to resolve whether the record shows that any reversible error based on the comment occurred.[9]

When ruling on a motion for mistrial, courts are to grant the motions "[o]nly in extreme circumstances, where the prejudice is incurable[.]"[10] When the motion concerns an allegedly improper comment by the prosecutor about the defendant's right not to testify, "the offending language must be viewed from the jury's standpoint and the implication that the comment referred to the defendant's failure to testify must be clear."[11] Thus, comments that do not directly refer to a defendant's failure to testify are generally not sufficiently "clear" when the comment merely

---

Ranger Bess had not been excused as a witness, and he returned after lunch to complete his testimony. After lunch, Ranger Bess returned to the witness stand and Swansey finished questioning him about the investigation he did into the shooting.

[9] *See* Tex. R. App. P. 33.1(a)(1) (requiring a timely request, objection, or motion that makes the trial court aware of the complaint to preserve error). To resolve the issue, we assume without deciding the short delay did not operate as a waiver of Swansey's complaints about the comment for the purposes of this appeal.

[10] *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) (explaining that a mistrial halts a trial proceeding when error is so prejudicial that expenditure of further time and expense would be wasteful and futile).

[11] *Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001).

implies or alludes to a defendant's failure to testify.[12] "The test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify."[13]

The record before us does not meet the above tests. The comment arose when the State was presenting its case-in-chief. And it occurred in the context of an argument the prosecutor raised complaining that the question Swansey's attorney asked Ranger Bess called for hearsay.[14] In the comment, the prosecutor did not identify Swansey as the person who was the only witness who could testify about Swansey's statement. And when the prosecutor made the comment, nothing in the record shows he knew that Swansey was not planning to testify at some point in the guilt-innocence phase of the trial.[15] For these reasons, we cannot construe the statement as one that was "manifestly intended" as a comment on Swansey's failure to testify.[16] Thus, we cannot say the jury would have necessarily taken the

---

[12] *Id.*

[13] *Id.*

[14] Tex. R. Evid. 802 (The Rule Against Hearsay).

[15] Perhaps the prosecutor thought Swansey would testify in his trial. In opening statement, Swansey's attorney told the jury that he believed the jury would find Swansey not guilty, explaining "I can just tell you that you will see his intent was aimed at the officer in that vehicle." The prosecutor possibly concluded from this comment that Swansey's attorney intended to call him to testify in the trial.

[16] *See Bustamante*, 48 S.W.3d at 765.

prosecutor's argument to mean that Swansey was not planning to testify in the trial.[17] We conclude the trial court did not abuse its discretion by denying Swansey's motion.[18]

Extraneous Evidence

In his second issue, Swansey argues the trial court abused its discretion by allowing the State to question Barbara about Swansey shooting at her when he passed her in his truck.[19] According to Swansey, Barbara's testimony about the fact Swansey shot at her was inadmissible because it was evidence of a bad act or crime and therefore inadmissible under Rule 404(b) of the Texas Rules of Evidence. In appeals challenging the admissibility of evidence under Rule 404, we review a trial court's ruling that allowed the jury to consider the evidence for abuse of discretion.[20] A trial court does not abuse its discretion if its ruling was correct under any theory of law that applies to the defendant's case.[21]

---

[17] *Id.*

[18] *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010) ("A trial judge's denial of a motion for mistrial is reviewed under an abuse of discretion standard[.]").

[19] Swansey objected to Barbara's testimony in the trial and preserved his right to complain in his appeal that her testimony about shooting at her was inadmissible in a trial that involved the shots Swansey fired at Deputy Sanders and at John's home. The trial court overruled Swansey's objection and allowed Barbara to testify.

[20] *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (citing *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005)).

[21] *Id.* (citing *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982)).

While Rule 404(b) has many exceptions, it generally prohibits parties from introducing evidence showing that a defendant committed another crime, wrong, or act when the other crime, wrong, or act the witness is referring to is not the crime, wrong, or bad act that is on trial.[22] In its brief, the State argues that the trial court had the discretion to admit Barbara's testimony because it revealed the facts and circumstance relevant to showing the context in which the offenses for which Swansey was on trial occurred. According to the State, the trial court had the discretion to allow Barbara to testify that Swansey shot at her after leaving John's house because it is contextual evidence that is permissible under exceptions to Rule 404(b).

Rule 404(b) contains numerous exceptions.[23] And even the exceptions specifically listed in Rule 404(b) are not exhaustive.[24] For example, some of the exceptions to Rule 404(b) allow trial courts to admit evidence showing a defendant committed an extraneous crime if the evidence about the extraneous crime is relevant to proving the defendant's "motive, opportunity, intent, preparation, plan,

---

[22] Tex. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

[23] *Id.* 404(b)(2).

[24] *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on rehearing).

14

knowledge, identity, or absence of mistake or accident" on the crime on which the defendant is tried.[25] At trial, the State argued Barbara's testimony put the crime in context. Explaining the same-transaction, contextual evidence exception, the Court of Criminal Appeals explained that evidence about an extraneous crime or bad act may "be admissible as same-transaction, contextual evidence where 'several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction and full proof by testimony, . . . , of any one of them cannot be given without showing the others.'"[26]

Here, the record supports the trial court's ruling to admit Barbara's testimony as same-transaction, contextual evidence. The testimony in the trial supports the inference that Swansey was aware the police were chasing him after he left John's house. Under the circumstances, the trial court could reasonably infer that Swansey fired at Barbara to injure her or to disable her car in an effort to create a distraction that required the officers chasing him to discontinue the chase so they could investigate whether Barbara needed immediate care. Under Texas law, evidence about the efforts defendants make to avoid arrest may be relevant to prove the

---

[25] *Devoe*, 354 S.W.3d at 469.

[26] *Id*. (quoting *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000)).

defendant committed the crime for which he was tried.[27] Thus, evidence showing

the defendant engaged in conduct designed to avoid arrest after committing the crime

that is the subject of the trial is evidence from which the jury can infer the defendant

was attempting to evade his arrest because he knew he committed the crime or

crimes involved in the trial.[28]

Here, none of the evidence shows Swansey would have fired at Barbara for

any reason other than to evade arrest on the crimes at issue in his trial. Even if another

explanation existed, and we see none, they "would go to the weight, not the

admissibility, of the evidence."[29] We conclude the trial court did not abuse its

discretion by admitting the evidence that Swansey shot at Barbara after leaving

John's home. Because the trial court did not abuse its discretion by admitting

Barbara's testimony, we overrule Swansey's second issue.

---

[27] *See Fentis v. State*, 582 S.W.2d 779, 781 (Tex. Crim. App. 1976) (evidence showing the defendant shot a police officer who approached the defendant in Garland, Texas was admissible in a case involving a murder even though the murder occurred in Houston more than three months before because showing the defendant fled arrest is a fact probative of the defendant's knowledge that he was guilty of committing a murder).

[28] *Id.*

[29] *Id.*

Recordings of Telephone Conversations from the Jail

In issue three, Swansey complains that, in the punishment phase of the trial, the trial court erred by admitting portions of the recorded conversations he had with members of his family while he was in jail. Swansey objected to the recordings arguing they were not relevant and were overly prejudicial when the State sought to introduce them at trial. In response to his objections, the trial court listened to the parts of the recordings the State wanted the court to admit in a hearing outside the presence of the jury. The court then allowed the State to introduce most of the recordings the prosecutor wanted the jury to hear in the trial. In its brief, the State argues that all the conversations the jury heard were relevant and not unduly prejudicial because they reveal character traits relevant to deciding John's punishment for the crimes the jury found he committed in the trial.[30]

In the trial, Swansey's objections to the recordings focus on the same two concerns: whether the recordings are relevant to issues of punishment and whether they were unduly prejudicial. In one of the recordings, for example, Swansey can be heard discussing with his mother why he didn't want to accept an offer requiring him to serve a fifty to sixty-year sentence. In others, Swansey mentions the sentences

---

[30] There recordings contain a warning audible to the caller and to the person who picks up the phone at the beginning of the calls. The warning states "[a]ll phone calls are subject to monitoring and recording."

that were received by other defendants in other cases, so those cases revolved on conduct that Swansey then discusses and compares to his. In another recording, Swansey explained he did not agree that crimes against police officers should be punished more severely than when the crime involved private citizens. In another, Swansey criticizes his attorney because he felt the attorney had not communicated with him enough about his options so he could avoid going to trial. In yet another, Swansey is heard making derogatory comments about an inmate whom he believed to be a homosexual. None of the testimony relevant to Swansey's convictions, however, show that a sexual animus against homosexuals was a factor in his conduct involving the cases on which he was tried.

During the hearing to decide whether to admit the recordings, the prosecutor argued the recordings were relevant because they revealed Swansey's personal assessment of his culpability for the crimes. Swansey's attorney argued that parts of the recordings were not relevant and if they were relevant, they would be unduly prejudicial. The trial court sustained Swansey's objections in part, and it excluded any statements where anyone stated the exact terms of the plea bargain the prosecutor offered to Swansey in return for pleading guilty in the seven cases. But the trial court then allowed the jury to hear Swansey describe why he did not want to accept a plea offer that would have required him to serve a fifty to sixty-year

sentence. In that recording, Swansey's mother states that if Swansey didn't like the offer, he shouldn't take it. Thus, while the jury did not hear the exact terms of the proposed plea bargain, it heard the basic terms of the plea that Swansey was offered.

To resolve the dispute, we must first decide whether the parts of the recordings that Swansey objected to were relevant to the issues the jury should have considered in punishment. In a punishment hearing, the court may allow the parties to introduce evidence "as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, [and] the circumstances of the offense for which he is being tried[.]"[31] Thus, the Legislature has authorized trial courts to allow the jury to hear the wide-range of information the jury needs to fashion an appropriate sentence.[32] That said, trial courts must still restrict the evidence in punishment hearings to the evidence that is "relevant to sentencing." [33] Stated another way, the statute does not allow trial courts to disregard the Rules of Evidence.[34] An abuse-of-discretion standard applies to evidentiary rulings that trial court's make in the punishment phase of a trial.[35]

---

[31] Tex. Code. Crim. Proc. Ann. art. 37.07, § 3(a)(1); *Beham v. State*, 559 S.W.3d 474, 478-79 (Tex. Crim. App. 2018).

[32] *Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009); *Erazo v. State*, 144 S.W.3d 487, 491 (Tex. Crim. App. 2004).

[33] *Ellison v. State*, 201 S.W.3d 714, 722 (Tex. Crim. App. 2006).

[34] *Id*.

[35] *Id*.

Trial courts do not abuse their discretion if the ruling the defendant challenges is a ruling that falls within the zone of reasonable disagreement.[36]

Turning to whether the parts of the recordings that Swansey objected to were relevant, we note that relevant evidence is evidence that tends to make the existence of any fact or consequence more or less probable than it would be without the evidence.[37] And relevant evidence may still be excluded if it is unduly prejudicial.[38] Evidence is unduly prejudicial when its probative value is substantially outweighed by the danger of unfair prejudice.[39] "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."[40]

In part, Swansey argues the trial court should not have allowed the jury to hear the comments he made in the recordings suggesting he did not think it should matter whether one of the victims was a police officer. Swansey's recorded statement reveals that in his opinion, the lives of police officers deserve no greater protection than the lives of others. In our opinion, Swansey's view about police officers is at least arguably relevant in a case involving a punishment that involved a crime against

---

[36] *Id.*

[37] Tex. R. Evid. 401.

[38] *Id.* 403.

[39] *Id.*

[40] *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010).

an officer who was on duty when Swansey assaulted the officer. Statements that reveal how a defendant views the types of people who are victims of the crime the defendant committed are relevant to how severely the defendant should be punished for his conduct. And in cases involving public servants, the Penal Code provides a more severe penalty when the crime is against a public servant who is discharging his duties.[41] Because Deputy Sanders was one of Swansey's victims and the deputy was on duty when the crime occurred, Swansey's comments about police officers were relevant to his punishment. And the evidence, while prejudicial, was not *unfairly* prejudicial to the issues in punishment in the context of this trial.[42]

That said, we cannot reach the same conclusion about the statements Swansey made discussing why he decided to reject a plea that would have required him to serve a fifty to sixty-year sentence. When statements concern plea bargains, the Court of Criminal Appeals has made it clear that the relevance of discussions about

---

[41] *See* Tex. Penal Code Ann. § 22.02(b)(2)(B) (elevating aggravated assaults that cause a serious bodily injury or involve the use of a deadly weapon from a second degree felony to a first degree felony if the aggravated assault is committed against "a person the actors know is a public servant while the public servant is lawfully discharging an official duty").

[42] Tex. R. Civ. P. 403 (allowing court to exclude "relevant evidence if its probative value is substantially outweighed by a danger of . . . *unfair* prejudice") (emphasis added).

plea bargains are at best minimal.[43] Allowing evidence about a potential plea bargain also carries a significant risk of unfair prejudice because such discussions have a significant risk they will mislead the jury regarding the things it should be considering in assessing an appropriate sentence.[44] In *Smith v. State*, for example, the Court of Criminal Appeals found the danger of unfair prejudice outweighed the probative value of evidence about a defendant's plea bargain, presented an undue risk of confusing the issues, and had a tendency to mislead the jury in discharging its duty to assess an appropriate sentence.[45]

Swansey's statements discussing the prospects of pleading guilty in return for a fifty to sixty-year sentence was not information relevant to the normative factors juries should be considering in punishment. Section 37.07 of the Code of Criminal Procedure describes the types of evidence generally admissible during punishment.[46]

---

[43] *Prystash v. State*, 3 S.W.3d 522, 527-28 (Tex. Crim. App. 1999); *Smith v. State*, 898 S.W.2d 838, 843-44 (Tex. Crim. App. 1995).

[44] *Id*.

[45]  *Smith*, 898 S.W.2d at 843-44.

[46] Tex. Code Crim. Proc. Ann. art. 37.07, § 3 (a)(1) (in a non-exhaustive list identifying the matters relevant to punishment, the Legislature identifies as relevant to the defendant's criminal record, his general reputation, his character, opinions about his character, the circumstances of the offense for which the defendant was tried, evidence of any extraneous criminal or bad acts the State shows the defendant committed beyond reasonable doubt, and any adjudications of delinquency the defendant committed when based on felonies or on misdemeanors punishable by a sentence in a jail). In the recordings, Swansey told family members that his attorney had been "paid off[,]" had "set him up[,]" had failed to meet and communicate with

Here, information about a proposed plea as well as the statements Swansey made discussing the sentences received by other defendants was highly prejudicial to his right to have the jury consider the sentencing range the trial court instructed the jury to consider. And when the jury heard Swansey describe the sentences that other defendants in other cases received, the jury did not have the type of detailed information that would have allowed it to determine whether those cases were similar or dissimilar to the circumstances involved in the cases on which Swansey was tried. The jury did not know, for example, whether the cases against those defendants were weak or strong, did not know anything about whether any of those defendants had criminal records, and from Swansey's discussion about the other cases, did not have sufficient information to determine whether the crimes committed by others that Swansey mentioned were cases that were comparable to Swansey's.

In a punishment hearing, the jury is generally asked to consider a sentence in a broadly defined range. On Swansey's conviction for the aggravated assault of a public servant, for example, the court instructed the jury to consider sentences of life

---

him about his case, and refused to return calls and respond to letters. Swansey also commented that he did not want to be jailed with a homosexual. His comments, even if offensive, were not evidence from which a factfinder could infer that Swansey committed an extraneous bad act or crime.

or a term of not more than ninety-nine years or less than five.[47] Other instructions about the other convictions involved smaller ranges, but all of the cases included a lower range. In Swansey's cases, the jury assessed maximum punishments in six of the seven cases after hearing Swansey explain why he thought a fifty or sixty-year sentence was too long. We can't now know whether the jury started at the lower range in deliberations or whether, instead, it chose to discuss a sentence at a much higher range given Swansey's recorded statements that explained why he was rejecting the opportunity he had to plead guilty.

Moreover, Swansey's statements mention that plea negotiations are not the only statements the jury heard in the recordings that have little to no relevance on the normative issues relevant to punishment. The recordings include Swansey's comments suggesting he was unhappy with his attorney and that he did not want to be in the same cell as another person he believed to be a homosexual. Swansey's personal feelings about homosexuality, however, were not relevant when no evidence in his cases revealed a sexual animus against homosexuals motivated any of his crimes. Given the context of the evidence before the jury in Swansey's trial, Swansey's statements about not wanting to be housed with a homosexual do not reveal that he is a person of good or bad character. His personal feelings about

---

[47] Tex. Penal Code Ann. § 12.32.

homosexuals as a class do not amount to a prior bad act or crime. And nothing in the recordings show that Swansey committed a crime against a homosexual while in jail.

Likewise, Swansey's statements expressing frustration with his lawyer had no bearing on a character trait relevant to punishment. Whether a person likes or dislikes lawyers as a class or the lawyer representing the person in a particular case is not relevant to the defendant's character in a case that did not involve any victims against whom the defendant committed a crime based on his dislike for lawyers. To sum it up, based on this record, Swansey's personal feelings the jury heard him discuss about homosexuals and his lawyer is not evidence relevant to any issues that were relevant to his punishment

Assuming the statements the trial court should have excluded as not being relevant have any relevance to punishment, that relevance is outweighed by the danger of unfair prejudice. In the context of the trial, such evidence presents a very high risk of misleading or confusing the jury.[48] We conclude the trial court erred by failing to exclude the recorded statements to the extent they describe Swansey's views about homosexuals, his frustration with his attorney, and his plea bargain.

Having found error, we must decide whether the error affected Swansey's substantial rights. To be sure, the overwhelming evidence in the record shows that

---

[48] Tex. R. Evid. 403.

Swansey engaged in extremely violent conduct even though none of the shots hit their mark. His crimes were motivated by anger and jealousy, as he fired shots at a group that included his former girlfriend, her new boyfriend, and the children standing in front of John's house. While we agree the punishment for that conduct should be severe, the question here is whether we have fair assurance that the errors admitting evidence did not affect his punishment.[49] If we have such assurance, we may still affirm the judgment even though there were errors admitting evidence when viewing the record as a whole.[50]

We consider a non-exhaustive list of factors to decide whether the errors affected the result. The factors include whether erroneously admitting the statements we have described affected the severity of the sentences, the strength of the evidence proving Swansey's guilt, the State's theory of the case, the defendant's theory of the case, the parties' closing arguments, and whether the State emphasized the error in closing.[51]

Here, the evidence that Swansey committed all seven crimes is overwhelming. The evidence shows the police caught Swansey red-handed. John identified Swansey

---

[49] Tex. R. App. P. 44.2(b); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

[50] *Motilla*, 78 S.W.3d at 355.

[51] *Id.* at 355-56.

as the shooter as soon as he drove into the driveway. There was no evidence that Swansey tried to conceal his identity with a disguise. The evidence established that Swansey had several prior convictions for committing crimes, including two felonies that he committed just two months before firing the rifle at John's home. One of Swansey's prior felonies involved a conviction for assaulting Sally by impeding her breath. The other is a felony abandonment case involving a child. Both tend to show Swansey's violent nature, and both are highly probative of his character since the evidence shows he was on probation for these two felonies when he shot at John's home.

Turning to the mitigating evidence in the trial, Swansey argued that he was suffering from longstanding mental problems and that he needed mental-health treatment when the shooting occurred. But Swansey called no expert witnesses to support that claim; instead, he relied on his mother, who testified that he suffered from severe depression, anxiety, and bipolar disorder. He also called a friend, who testified that Swansey had received psychiatric treatment at a facility before the shooting occurred. Swansey also called one of his former employers, who testified that Swansey was a good worker that he would rehire should he need to hire more employees.

27

While we agree that harsh sentences were justified by the evidence before the jury, we still do not have fair assurance that the jury would have given Swansey maximum sentences in six of his seven cases had the trial court excluded the parts of the recordings that have, at most, very little bearing on the issues relevant to his punishment. Throughout the trial, the State's theme was that Swansey was beyond redemption and society needed to be protected from him. In the punishment phase, and in opening argument, the prosecutor suggested the recorded conversations would show why Swansey deserved a life sentence. According to the prosecutor, the recordings would give the jury insight into Swansey's "mindset, his views regarding the crimes that you have found him guilty of, his attitude about the value of human life, his – I guess his consideration of his own culpability, too, for the commission of these crimes." But being critical of a lawyer, disliking members of a group, and refusing to settle a case do not justify increasing a sentence. Yet in Swansey's trial, some jurors might have considered the evidence the trial court excluded as relevant to punishment given the emphasis the prosecutor placed on the recordings in his opening argument.[52] For instance, Swansey's statements about rejecting a plea bargain to avoid trial could have angered the jurors that felt they were forced to serve on a jury when the dispute was over whether Swansey wanted an agreement that

---

[52] *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a).

28

allowed him to serve a lower sentence than the one he was offered. The testimony about the offer and the evidence about the sentences given other defendants may have also affected the jury's discussion of the range of sentence the trial court instructed the jury to consider in its charge. For these reasons, the record does not give us fair assurance that the erroneous admission of the parts of the recordings we have described did not play some role in the severe sentences the jury assessed in Swansey's cases. Last, we note that the inadmissible parts of the recordings were not cumulative of some other evidence already before the jury in some other form.

Viewing the record as a whole, we do not have fair assurance that the erroneous admission of the complained-of recordings did not adversely affect the sentences Swansey received in his trial.[53] For that reason, we sustain Swansey's third issue.

Remaining Issues

In issue four, Swansey argues the trial court erred by allowing Dr. Gaines to testify about Swansey's mental condition and to express the opinion that he is dangerous. In issue five, Swansey argues the trial court erred by excluding the evidence he wanted to offer to show he expressed remorse. And in issues six through

---

[53] *See Chapman v. State*, 150 S.W.3d 809, 818-19 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd); *Aleman v. State*, 49 S.W.3d 92, 96 (Tex. App.—Beaumont 2001, no pet.).

29

eight, Swansey argues the trial court erred by erroneously taxing him with certain costs of court and by ordering him to pay fines in each of his seven convictions when the State tried him in a single proceeding. In response to issues six through eight, the State concedes the trial court erred. The State suggests the judgment can be reformed to correct the errors the trial court made when awarding taxable costs and fines.

Given our resolution of Swansey's third issue, in which we granted Swansey another hearing on punishment, we conclude the matters Swansey complains about in issues four and five are moot. In the next punishment hearing the trial court conducts on remand, it should reconsider whether the evidence about Swansey's mental condition, dangerousness, and remorse are relevant to the issues before the jury in punishment. We cannot evaluate what the evidence in that hearing might show. That said, we agree with the State that the trial court erred in the manner that it calculated taxable costs and fines. We need not correct those errors, however, since the trial court can correct its calculation on these matters after completing the new punishment hearing we have ordered that it conduct.

## Conclusion

As to the findings that Swansey is guilty of committing the crimes at issue in his appeals, the trial court's judgments are affirmed. As to punishment, however, the judgments in trial court causes 25,406 through 25,412 are reversed. We remand

causes 25,406 through 25,412 to the trial court and order the trial court to conduct another trial to decide issues related to Swansey's punishment in these seven cases.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

_____
HOLLIS HORTON
Justice

Submitted on May 22, 2020
Opinion Delivered October 14, 2020
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.

31